# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **FRANK WILLIS** | * | **CIVIL ACTION NO. 05-1010** |
| **VERSUS** | * | **JUDGE JAMES** |
| **T R C COMPANIES, INC.** | * | **MAGISTRATE JUDGE HAYES** |

## MEMORANDUM RULING

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Disqualify Counsel of Plaintiff[1] filed by Defendant, TRC Companies, Inc. ("TRC"). (Doc. #27). Plaintiff, Frank Willis ("Willis") opposes the motion (Doc. #29); TRC has filed a reply brief (Doc. #34). For the reasons stated below, Defendant's Motion to Disqualify Counsel of Plaintiff (Doc. #27) is **DENIED**.

## STATEMENT OF FACTS

Plaintiff is represented by Jimmy R. Faircloth, Jr. of Faircloth, Vilar & Elliott, L.L.C. ("Faircloth Vilar"). TRC is represented by various attorneys at the law firm of Gold, Weems, Bruser, Sues & Rundell ("Gold Weems"). Willis initiated this action by filing suit in this court on June 10, 2005. At that time, Kenneth Ortego ("Ortego") was an attorney associated with Gold Weems. On February 28, 2006, while the current action was ongoing, Ortego resigned from Gold Weems and was subsequently employed by the Faircloth Vilar firm. TRC filed the current motion arguing that local ethical rules, Fifth Circuit precedent, and societal interests require that

---

[1] As this is not one of the motions excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court. Any appeal must be made to the district judge in accordance with Rule 72(a) and L.R. 74.1(W).

1

Jimmy Faircloth and Faircloth Vilar be disqualified as attorneys in this matter due to Ortego's former association with Gold Weems.

TRC also alleges that, while associated with Gold Weems, Ortego was consulted by Stephen A. LaFleur ("LaFleur"), another Gold firm attorney who was working on the present case. TRC argues that during these conversations, Ortego and LaFleur discussed legal theories, strategies, and information communicated by TRC. When Ortego left Gold Weems and joined Faircloth Vilar, counsel for TRC notified their client of the perceived potential conflict and TRC declined to waive the conflict. Defense counsel contacted Plaintiff's counsel about the potential conflict; Plaintiff's counsel declined to withdraw, contending that no conflict exists. Subsequently, the Motion to Disqualify was filed.

**LAW AND ANALYSIS**

Motions to disqualify counsel are governed by state and national ethical standards adopted by the court. *Horaist v. Doctor's Hosp.*, 255 F.3d 261, 266 (5th Cir.2001) (citing *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir.1992)). However, whether and how these rules are applied are questions of federal law. *In re American* at 610.

Ethical cannons relevant to a motion to disqualify include 1) the local rules of the Western District of Louisiana; 2) the American Bar Association's ("ABA's") Model Rules of Professional Conduct; and 3) the state rules of attorney conduct. *Horaist* at 266. The Rules of the Western District of Louisiana specifically adopt the Rules of Professional Conduct of the Louisiana State Bar Association. *See* La. Uniform R. U.S. Dist. Ct. LR83.2.4W.

The applicable Rules of Professional Conduct, in pertinent part, are:

**Rule 1.9 - Duties to Former Clients**

2

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
   (1) whose interests are materially adverse to that person; and
   (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
   (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
   (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

*State Bar Articles of Incorporation*, Art. 16, Rules of Prof. Conduct, Rule 1.9, LSA-R.S. foll. 37:222.

**Rule 1.10 - Imputation of Conflicts: General Rule**

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

(b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
   (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
   (2) any lawyer remaining in the firm has information protected by

   Rules 1.6 and 1.9(c) that is material to the matter.

*State Bar Articles of Incorporation*, Art. 16, Rules of Prof. Conduct, Rule 1.10, LSA-R.S. foll. 37:222.

The Fifth Circuit applies a two prong test in determining whether to disqualify an

attorney.

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish 2 elements: (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify; and (2) a substantial relationship between the subject matter of the former and present representations.

*American Airlines, Inc.*, 972 F.2d at 614 (citation omitted). TRC argues that an attorney-client relationship existed between Ortego and TRC. TRC states that Ortego was a member of Gold Weems at the time Gold Weems began representing TRC in the current matter. TRC points out that all written correspondence between TRC and Gold Weems was conducted using firm letterhead that listed Ortego as an attorney with the firm. TRC argues that it was reasonable for it to expect that Gold Weems would be representing TRC through any of the attorneys at Gold Weems. TRC argues that it had an attorney-client relationship with Gold Weems and it is reasonable for TRC to believe that the relationship applied to all attorneys practicing at Gold Weems.

Faircloth Vilar argues that Gold Weems is mistaken to assume that an imputed attorney-client relationship between TRC and Ortego would travel with Ortego once he left the employment of Gold Weems. Pursuant to Rule 1.9(b), *supra*, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a ***firm with which the lawyer formerly was associated*** had previously represented a client whose interests are materially adverse to that person ***and*** about whom the ***lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter***. (emphasis added). It is undisputed that Gold Weems is representing TRC in the same matter as was pending when Ortego was employed by Gold Weems. However, in order to justify disqualifying the plaintiff's counsel under Rule 1.9, Ortego must either have personally represented TRC, or must have

4

acquired material information on the matter that is protected by Rules 1.6 and 1.9(c).

LaFleur has provided an affidavit stating that

> On at least one occasion, believed to have been between July 7, 2005 and August 18, 2005, [LaFleur] discussed the subject matter of [the TRC] action with Kenneth Ortego ... [LaFleur] specifically discussed the legal theories and facts advanced by plaintiff in his complaint filed in the instant action. [LaFleur] further sought advice related to strategies, defenses and counterclaims which might be asserted by TRC based on specific facts which TRC disclosed to [LaFleur] to aid in defense of the instant action. ... The information which [LaFleur] disclosed and discussed with Mr. Ortego was (a) confidential, (b) subject to attorney-client privilege, (c) subject to the attorney's duty to maintain the confidentiality of information relating to the representation of a client, and (d) materially related to this case.

Doc. #27-2 - Exhibit A. Ortego has provided an affidavit stating that

> During my interview with [Faircloth Vilar] ... I was informed about the cases involving both [Faircloth Vilar] and Gold Weems, and asked whether I had personally represented those Gold Weems clients, worked on those files, or otherwise acquired privileged information about those clients. I stated that I had not.
>     On May 11, 2006, Mr. Faircloth informed me about questions raised by Ed Rundell concerning a "conversation" that I allegedly had with Steve Lafleur ... about the Willis - TRC litigation while employed at Gold Weems. I responded that I had no recollection of that conversation and asked Mr. Faircloth to request Gold Weems' billing records. In addition, I called and spoke to Mr. Lafleur about the alleged conversation. Attached is a copy of my original notes made during that conversation, which reflect as follows:
> KOO: What was the deal?
> SL:   We had a short conv - 10 or 15 or maybe 20 mins - don't have clear recollection.
> KOO: About what?
> SL:   Was right after suit was filed - I was trying to get handle on "failure of cause theory" and was asking you about it and trying to figure out how to respond.
> SL:   Admittedly not very substantive or substantial involvement.
> SL:   I know of 1 conv., might have been 2 conv., but I'm not sure about that.
> KOO: Did I bill file?
> SL:   We don't know that yet.
> KOO: Did I know it was Frank Willis?
> SL:   I'm fairly sure I recall saying this was Willis Company v. TRC.
> SL:   Sorry, but I had oblig. To tell Charlie Weems - admit it was not much and we're pretty sure you didn't even bill file, but I had to tell him.

5

> While I was at Gold Weems, Mr. Lafleur was an inexperienced associate attorney. On the few occasions when he sought my substantive input on client or file specific matters, I billed my time. And based on my familiarity with Gold Weems' standard billing practices, I expected Mr. Lafleur to make a corresponding entry for his time.
>
> I have no recollection of any conversation with Mr. Lafleur concerning the litigation involving Willis Engineering, TRC and Frank Willis. In addition, I have never spoken to any representative of TRC on any subject and I have never prepared, reviewed, or offered comment on any documents involving TRC.
>
> I have reviewed the Affidavit of Mr. Lafleur. ... Although I have no recollection of the conversation he describes, I cannot categorically deny the possibility of a brief conversation with him about an abstract legal theory. Frankly, it was common for Mr. Lafleur to talk about his assignments with anyone who would listen. However, based on my 26 years of experience, I categorically deny that any such conversation was specific enough or substantive enough to support an attorney-client relationship between me and TRC. If it had been, I would not have hesitated to bill my time on the file, and I would have expected Mr. Lafleur to do the same.
>
> I also deny that Mr. Lafleur relayed any TRC confidences to me during the alleged conversation. First, to my knowledge, Mr. Lafleur very rarely had client contact. Second, when I spoke with Mr. Lafleur by telephone on May 11, he did not make any mention of client confidences; rather, he described a purely academic conversation about a legal theory asserted in the petition. And, finally, I am confident that I would remember, and would have billed for, any conversation that involved client confidences.

Doc. #29-2 - Exhibit D. LaFleur also filed a supplemental affidavit stating that

> Knowing that Ortego was then associated with [Faircloth Vilar], [LaFleur] was surprised and concerned to receive a telephone call from Ortego on May 11, 2006, in which conversation Ortego asked [LaFleur] questions regarding the substance of any conversation that they may have had regarding the matter of Willis v. TRC Companies, Inc.
>
> [LaFleur] was of the belief that to reveal any information to Ortego regarding the very same confidential client information which he discussed with Ortego while Ortego was an attorney associated with Gold Weems, would now amount to a breach of his duty to his client to keep confidential all information relative to the representation of that client under Louisiana Professional responsibility rule 1.6(a).
>
> [LaFleur] was deliberately vague and general in the telephone conversation with Ortego in an attempt to be polite, while at the same time attempting to avoid a breach of his duty pursuant to rule 1.6(a).
>
> On a number of occasions prior to his conference with Ortego, [LaFleur] had direct client contact with representatives of TRC Companies, Inc., including substantive discussions with TRC representatives concerning the substance of the

6

> claims of the respective parties, litigation strategies, and evidentiary issues related to those strategies, all of which were considered confidential and subject to attorney-client privilege.
>
> Some of the confidential client communications described in general terms above were included in or comprised a part of the conference with Ortego which has been described in [LaFleur's] original affidavit attached to TRC's Motion to Disqualify.

Doc. #34-2 - Exhibit E.

No billing records for either LaFleur or Ortego have been produced to support the movant's claim that the conversation recalled by LaFleur occurred. The undersigned finds that it is not merely unlikely, but well nigh impossible to believe that any substantive conversation involving information protected by Rule 1.6 would have occurred without at least one and probably both of the attorneys billing the client for their time. The lack of specificity in LaFleur's affidavit, and the even greater lack of specificity or clear recollection by LaFleur as demonstrated by Ortego's notes of his conversation with LaFleur, also weigh against any real substance to the allegations against Ortego.

Furthermore, Faircloth Vilar took steps prior to hiring Ortego to ensure that no conflicts existed. In February 2006, Faircloth Vilar hired Barbara Melton and Ortego, both formerly employed at Gold Weems. During separate interviews, they were each questioned about potential conflicts, and specifically about the current litigation. Both Barbara Melton and Ortego denied any involvement in or knowledge of confidential information concerning the Willis-TRC litigation.

The fact that Ortego was specifically questioned about this matter prior to going to work for Faircloth Vilar, and the fact that he did not then and does not now recall having any conversation about or performing any work on behalf of TRC, also supports Faircloth Vilar's position that no attorney-client relationship existed between Ortego and the defendant, and that

7

Ortego learned no confidential or privileged information which could be used against TRC in these proceedings.

Finally, the mere fact that Ortego's name was on the letterhead of Gold Weems while he was employed there, without more, is insufficient to give rise to a reasonable belief by the defendant that Ortego personally represented it. Thus, Defendant has not established that Ortego had acquired protected information as required by Rule 1.9(b), or that an attorney-client relationship existed between Ortego and TRC as required by Rule 1.9(a).

In the absence of an attorney-client relationship or proof that protected information was disclosed to the imputedly disqualified attorney, the court turns to Rule 1.10 to resolve this matter. Since 1.10(b) would not prohibit a firm from taking on representation adverse to a former client of the firm after all attorneys who had an actual attorney-client relationship or who were privy to confidential information about the client left the firm, then *a fortiori* an attorney who was disqualified by imputation alone does not carry the imputed disqualification with him when he leaves his former employment, and his association with a new firm does not disqualify the new firm.

Indeed, in this case, the new firm has taken the additional step of prohibiting Ortego from having any contact with this case, and screening him from any knowledge of it. While such a "Chinese wall" has not been recognized by the Fifth Circuit as sufficient to protect the interests of a former client when an actual attorney-client relationship existed, in cases such as this one, where the initial disqualification was an imputed one, the added step of screening the imputedly disqualified attorney from any contact with the case addresses even any possible appearance of impropriety.

Therefore, the Defendant's Motion to Disqualify Counsel of Plaintiff (Doc. #27) is

**DENIED**. **THUS DONE AND SIGNED** this 27th day of September, 2006, in Monroe, Louisiana.

```
                              KAREN L. HAYES
                              U. S. MAGISTRATE JUDGE
```