RECEIVED
IN MONROE, LA

MAY 1 2 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

FRANK WILLIS

VERSUS

TRC COMPANIES, INC.

CIVIL ACTION NO. 05-1010

JUDGE ROBERT G. JAMES

MAG. JUDGE KAREN L. HAYES

### RULING

Pending before the Court are motions filed by the parties: Defendant TRC Companies,

Inc. ("TRC") has filed a Motion for Partial Summary Judgment and Alternative Motion for

Judgment on the Pleadings ("Motion for Partial Summary Judgment") [Doc. No. 77], and

Plaintiff Frank Willis ("Willis") has filed a Motion for Summary Judgment as to TRC's

Counterclaim Against Willis [Doc. No. 78].

In its Motion for Partial Summary Judgment, TRC moves the Court to dismiss Willis's

claims of fraud and negligent misrepresentation. In his Motion for Summary Judgment, Willis

moves the Court to dismiss TRC's counterclaims of breach of contract and of a violation of §

10b-5 of the Securities and Exchange Act, 15 U.S.C. § 78j, et seq.

For the following reasons, TRC's Motion for Partial Summary Judgment is DENIED, and

Willis's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

### I.    FACTS AND PROCEDURAL HISTORY

Willis, a certified professional civil engineer, has worked in the Alexandria area since

1980. In 1989, he formed Willis Engineering, Inc. ("WEI").

1

In the summer of 2004, Willis entered into negotiations with representatives of TRC for the sale of WEI. In connection with the sale, Willis was represented by H. Brenner Sadler, a tax attorney, and Lindsey Torbett, a C.P.A.

TRC presented two preliminary offers to Willis on June 25 and 29, 2004, in the form of memoranda from then-C.E.O. Dick Ellison ("Ellison"). In each of the two offers, Ellison made the same two statements: (1) that "[b]y integrating with TRC's SGS Witter Team ("Witter") in Alexandria and close support from the TRC-Hunter organization in Texas, Willis will have the technical support and critical mass to capitalize on larger more profitable projects" and (2) that "[a]ccess to TRC resources will free you to aggressively pursue projects that were once too complex or geographically restrictive to successfully execute." [Doc. No. 78, Exhs. A & B].

In July 2004, WEI sent invoices to some current clients, including the Avoyelles Water Commission ("AWC"). At that time, Willis had completed the design for the project for the AWC.

Prior to finalizing any acquisition, TRC conducted a due diligence review. On July 27, 2004, TRC financial employees, Greg Hobbs ("Hobbs") and Stephen MacNeil ("MacNeil"), Vice President and Controller of TRC Environmental Corporation, did an on-site inspection of WEI. Hobbs and MacNeil met with Willis and obtained documents from WEI's bookkeeper, Christina Chamberlain ("Chamberlain").

Following the visit, MacNeil sent an email to Hemant Wadhwa ("Wadhwa"), assistant to Ellison who was a specialist in acquisitions. The email was also sent to the General Counsel, Martin Dodd, and the C.F.O., Harold Elston. MacNeil questioned the wisdom of the WEI acquisition because its value was based upon Willis remaining as an employee after his proposed

2

employment agreement and earnout period ended. He pointed out concerns about growth of the business because WEI had a "stormy" relationship with Witter, the local firm that was expected to provide support. He was further concerned because TRC's Hunter (Texas) office had not worked effectively with TRC's Ft. Worth office, located one-half hour away, and thus could not be expected to work effectively with or provide support to WEI in Louisiana.[1] Additionally, MacNeil raised concerns about WEI's accounts receivable and work in progress, particularly, the AWC:

> I know the [accounts receivable] issue has been talked about. ie: the $700K of unbilled that appeared at the end of negotiations. . . that is a red flag to me. Maybe [Willis] thought he could put those dollars into first TRC earnout year . . . [We're] talking about a half year of revenue here. By the way, the bulk of that [work in progress] was billed in July [2004]. Need to keep that in mind when dealing with net worth test. There is probably about $200K of that left to bill and it[']s unclear how much work is left to finish that project. The major one was [AWC]. I would recommend confirmation from the client regarding collectability and detail for estimate to complete. It sounded like there was going to be some nonbillable activity left or current [work in progress] that may not be billed. My understanding is that we may be covered from the [profit and loss] perspective already but am more concerned about the go forward effort.

[Doc. No. 78, Exhibit J]. MacNeil testified that he was concerned about AWC because he was afraid that TRC would "be doing work on our nickel and not be able to bill for that, or that the

---

[1]MacNeal used the term "synergy," which he defined as follows:

Synergies can cover a number of things. An acquisition, whether it's going to be successful or fail, there's a number of criteria that will come down to that. Obviously, there's the financial performance. The synergies that would be involved with being able to provide assistance, capital resources that maybe a smaller company didn't have before, and that would allow them the opportunity to grow the business and get involved again with growing the business, getting more clients, not dealing with the day-to-day; those are the synergies I'm talking about, and then also work sharing with other locations across the company . . . .

[Doc. No. 78, Exhibit K, pp. 33-34].

3

work we are doing related to an invoice that had already been issued." [Doc. No. 78, Exhibit K, p. 42].

In August 2004, WEI hired Stephen Fontenot ("Fontenot") as a civil engineer. According to Fontenot, when he came to work, the design for AWC had been completed and the project had gone to construction.

On September 1, 2004, Willis and TRC entered into a Stock Purchase Agreement ("the Purchase Agreement"). As part of the Purchase Agreement, Willis and TRC also entered into a three-year employment agreement for Willis. Under its terms, Willis was to continue as President of WEI and was responsible for day-to-day operations.

In April 2005, TRC hired Jeffrey Martin ("Martin"), an engineer and lawyer, as Operational Coordinator. Shortly after he was hired, Martin was assigned to WEI to "manage" projects. He is a professional engineer, but is not licensed in Louisiana and did not perform "hard" engineering for WEI.

In May 2005, Fontenot resigned from WEI because he believed that there were not enough engineers to handle the work load.

On June 10, 2005, Willis filed a Complaint alleging that TRC breached the Purchase Agreement and its employment agreement with him. Willis contends that he made clear that "his primary interest in selling WEI was the desire to have access to TRC's resources, especially engineers, to grow WEI." [Doc. No. 67, ¶ 6]. TRC gave him "unqualified assurances about the depth of its resources, telling Willis that he would have access to a 'pipeline' of engineers that would 'free' him to pursue larger, more profitable projects." [Doc. No. 67, ¶ 6].

In July 2005, Willis left his employment with TRC.

4

Following Willis's departure, TRC brought in John Thomas ("Thomas"), a civil engineer,

to complete the AWC project.  According to Thomas and Martin, TRC provided necessary

inspection and engineering and contract administration services on the AWC project until its

completion.

On November 19, 2007, TRC filed its Motion for Partial Summary Judgment, and Willis

filed its own Motion for Summary Judgment.  The parties have filed opposition and reply

memoranda.

The Court is now prepared to rule.

## II.   LAW AND ANALYSIS

### A.   Standard of Review

#### 1.   Motion for Judgment on the Pleadings

The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to

dismiss.  In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007).  The court

"accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."

Id. (internal quotations omitted).  However, "conclusory allegations or legal conclusions

masquerading as factual conclusions will not suffice to prevent a motion to dismiss" or motion

for judgment on the pleadings.  Taylor v. Books A Million, Inc., 296 F.3d 376, 378 (5th Cir.

2002) (citations and internal quotation marks omitted).

In ruling on a motion for judgment on the pleadings, the Court must employ the summary

judgment procedures of Federal Rule of Civil Procedure 56 "if matters outside the pleadings are

presented to and not excluded by the court."  Fed. R. Civ. P. 12(c).

5

## 2.    Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id. The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. Ashe v. Corley, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

6

### B.    Analysis

#### 1.    TRC's Motion for Partial Summary Judgment

TRC moves for summary judgment or, alternatively, for judgment on the pleadings on

Willis's claims of fraud and negligent misrepresentation.  TRC contends that it is entitled to

judgment on the pleadings because Willis's claims fail to meet the heightened pleading

requirements under the Federal Rules of Civil Procedure.  TRC further contends that it is entitled

to summary judgment because Willis has failed to raise a genuine issue of material fact whether

he reasonably relied on any alleged promises by TRC.

#### a.    Sufficiency of Willis's Allegations

Under Federal Rule of Civil Procedure 9(b), "[i]n all averments of fraud or mistake, the

circumstances constituting fraud or mistake shall be stated with particularity."  "What constitutes

'particularity' will necessarily differ with the facts of each case and hence the Fifth Circuit has

never articulated the requirements of Rule 9(b) in great detail."  Guidry v. Bank of LaPlace, 954

F.2d 278, 288 (5th Cir. 1992).  "However, [the Fifth Circuit] has found that the plaintiff must

allege with particularity 'the defendant's acts which the plaintiff contends amount to fraud.'"  Id.

(quoting Unimobil 84, Inc. v. Spurney, 797 F.2d 214, 217 (5th Cir. 1986)).  "It is possible that

the pleading requirements of Rule 9(b) may be relaxed in certain circumstances-when, for

instance, the facts relating to the fraud are 'peculiarly within the perpetrator's knowledge.'"

United States ex rel. Doe v. Dow Chemical Co., 343 F.3d 325, 330 (5th Cir. 2003) (quoting

United States ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir.

1999)).

TRC argues that Willis's allegations in the Amended Complaint under the headings for

Fraud and Negligent Misrepresentation[2] are inadequate under Rule 9(b) because they fail to identify the "who, what, when, where, and how" of the claims. Although TRC acknowledges that these paragraphs (like virtually every complaint filed in this Court) incorporate the factual allegations from other paragraphs, TRC argues that these factual allegations are also too "piecemeal" to meet the requirements of Rule 9(b).

Having fully reviewed the Amended Complaint, the Court disagrees. While the paragraphs under the specific heading for each count are somewhat conclusory, Willis spent ten (10) pages and twenty-three paragraphs identifying the factual basis for these two claims. Even viewed conservatively, Willis makes factual allegations to support his fraud and negligent misrepresentation claims in paragraphs 6, 8, 9, 11, 13, 14, and 15. There is only one defendant in this matter, TRC; thus, there is no issue of multiple defendants who are unsure of the allegations against them. It is clear from the Amended Complaint that the parties began negotiations in 2004, that Willis received alleged false assurances in the first and second "Preliminary Offer for Discussion" (which Willis received from Ellison), that he was given additional false assurances by "TRC contact, Craig Becker," in a June 26, 2004 email, and that TRC failed to disclose a negative report by TRC financial analyst, MacNeil, in the summer of 2004.

The Court finds that, even under Rule 9(b), these allegations are sufficient to survive a

---

[2]If a negligent misrepresentation claim stands on its own, then Rule 9(b) is not implicated. However, if "(1) a plaintiff waives arguments to the contrary or (2) the inadequate fraud claim is so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the fraud claim while leaving behind a viable negligent misrepresentation claim," then Rule 9(b) applies to both claims. Kitchell v. Aspen Exploration, Inc., No. 4:06-cv-273, 2007 WL 2901130 at *8 (E.D. Tex. Sept. 28, 2007).

motion for judgment on the pleadings.  TRC's alternative Motion for Judgment on the Pleadings, contained in TRC's Motion for Partial Summary Judgment, is DENIED.

### b.   Reasonable or Justifiable Reliance

Alternatively, TRC also moves for summary judgment on Willis's fraud and negligent misrepresentation.

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code art.1953.  To establish contractual fraud, a plaintiff must prove: "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract." Shelton v. Standard/700 Associates, 2001-0587 (La. 10/16/01); 798 So.2d 60, 64. "[F]or fraud or deceit to have caused plaintiff's damage, he must at least be able to say that had he known the truth, he would not have acted as he did to his detriment.  Whether this element is labeled reliance, inducement, or causation, it is an element of a plaintiff's case for fraud." Sun Drilling Products Corp. v. Rayborn, 2000-1884 (La. App. 4 Cir. 10/3/01); 798 So.2d 1141,1153 (citing In re Ford Motor Company Vehicle Paint Litigation, 1997 WL 539665 (E.D. La. Aug. 27, 1997)).

To establish negligent misrepresentation, the plaintiff must prove that the defendant had a duty to supply correct information, that the defendant breached that duty, and that the defendant's breach caused damages to the plaintiff. Waddles v. LaCour, 2006-1245 (La. App. 3 Cir. 2/7/07); 950 So.2d 937, 942; Doskey v. Hebert, 93-1564 (La. App. 4 Cir. 9/29/94); 645 So.2d 674, 681;

9

Beal v. Lomas and Nettleton Co., No. 12561 (La. App. 4 Cir. 1982); 410 So.2d 318, 321.
"Plaintiff must show damages as a result of his justifiable reliance on the defendant's
misrepresentations." Hughes v. Goodreau, 01-2107 (La. App. 1 Cir. 12/31/02); 836 So.2d 649,
663; Waddles, 950 So.2d at 943.

TRC contends that, even if Willis could otherwise meet his burden on these claims, he
cannot show that his reliance on TRC's alleged promises was reasonable or justified because the
Purchase Agreement contained an integration or merger clause, and the evidence shows that the
Purchase Agreement was fully integrated. Therefore, TRC contends that any reliance by Willis
on TRC's alleged promises was unreasonable as a matter of law.

Willis responds that the integration clause is irrelevant to his claims. He does not
contend that the Purchase Agreement should be supplemented with a side-deal or prior
agreement, but that TRC knew or should have known prior to the sale that it could not or would
not perform the contract as written. Alternatively, he argues that terms of the agreement are
ambiguous and can be interpreted with parol evidence. Finally, Willis contends that he was
reasonable to rely on TRC's misrepresentations, particularly about its available engineers,
because the deal he made would have been foolish without the potential to earn additional
income.

"Louisiana law recognizes certain situations where a plaintiff's reliance on a promise is
unreasonable as a matter of law." Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul
Guardian Ins. Co., 376 F.3d 399, 403 (5th Cir. 2004). Applying Louisiana law, the Fifth Circuit
has held that "a plaintiff's reliance on promises made outside of an **unambiguous**, fully-
integrated agreement was unreasonable as a matter of law." Id. at 403-404 (emphasis added)

10

(citing Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1330 (5th Cir. 1994)).[3]

There is no doubt in this case that there is a contract between the parties and that the
contract contains an integration clause. Nor is there any doubt that this contract was the result of
negotiations between two sophisticated parties. However, the Court cannot conclude at the
summary judgment stage that Willis's reliance on statements by TRC and its agents was
unreasonable as a matter of law.

Willis has argued that he was induced to enter into a contract with TRC because of his
prospective ability to take on new, more complex projects, which were not practically or
geographically feasible without additional engineering support. The contract between the parties
specifically provides that TRC will provide "sufficient resources," but fails to define or otherwise
qualify these terms. While the Court finds the integration or merger clause is relevant to the
analysis, in this case, it is not dispositive because the contractual terms at issue are ambiguous.
In fact, TRC's General Counsel and Senior Vice President, Martin Dodd ("Dodd"), who
participated in drafting the contract, testified that the terms "sufficient resources" were not
defined, but that the term "resources" could include engineers. He also admitted that the
resources could include personnel, documents, and administrative services that would allow WEI
to operate successfully.

_____

[3]Although these cases involved a claim of detrimental reliance, the issue of reasonable or
justifiable reliance is the same whether the asserted cause of action is called fraud, negligent
misrepresentation or detrimental reliance. See, e.g., Becnel v. Grodner, --- So.2d ---, 2008 WL 902510,
2007-1041 (La. App. 4 Cir. 4/2/08) (delictual fraud); Boes Iron Works L.L.C. v. Galatas, 07-336 (La.
App. 5 Cir. 12/11/07); 974 So.2d 713 (fraud); Systems Engineering and Sec., Inc. v. Science &
Engineering Associations, Inc., 2006-0974 (La. App. 4 Cir. 6/20/07); 962 So.2d 1089 (negligent
misrepresentation); Waddles v. LaCour, 2006-1245 (La. App. 3 Cir. 2/7/07); 950 So.2d 937 (negligent
misrepresentation).

Because of this ambiguity, Willis can present evidence of the resources he was allegedly promised and whether his reliance on these alleged promises was reasonable or justified.[4] TRC's Motion for Partial Summary Judgment is DENIED.[5]

## 2. Willis's Motion for Summary Judgment

Willis has also moved for summary judgment on TRC's counterclaims of breach of contract and under 15 U.S.C. § 78j, contending that TRC has no witnesses or other evidence to show that Willis's disclosures were incomplete or inaccurate.

### a. Breach of Contract

TRC alleges that Willis breached the Purchase Agreement by (1) billing clients prior to WEI's acquisition by TRC for work that had not yet been performed and failing to list this work as a liability on his financial disclosures; (2) failing to disclose all material contracts, commitments, and other obligations of WEI, (3) failing to disclose his practice of allowing WEI staff to apply his engineer's seal and signature to work product; and (4) performing his obligations in "bad faith."

---

[4] Whether characterized as parol evidence or not, Willis's evidence of promises made to him outside the terms of the contract is relevant to his claims of negligent misrepresentation and fraud because the contract is not clearly dispositive. Willis may present evidence to show that TRC promised him the support of engineers and other resources and either that TRC acted negligently in doing so (negligent misrepresentation) or that TRC had no intention of providing the support promised (fraud).

[5] In their reply memorandum [Doc. No. 97], TRC makes new arguments not previously raised in its Motion for Partial Summary Judgment. Specifically, TRC now contends that it is also entitled to summary judgment on Willis's fraud and negligent misrepresentation claims because the "promises" upon which Willis relies are mere puffery. TRC also contends that Willis has failed to allege any duty owed by TRC, a necessary element of his negligent misrepresentation claim. The Court declines to address arguments raised for the first time in a reply. It may be error to grant summary judgment on a ground not raised in the motion when the opposing party has no opportunity to respond. See John Deere Co. v. Am. Nat'l Bank, Stafford, 809 F.2d 1190, 1192 (5th Cir. 1987). TRC can raise these arguments at trial.

12

Willis moves for summary judgment contending that, as to each of the four areas, TRC lacks sufficient evidence of breach and that TRC has produced no evidence that it was damaged by any such alleged breach.

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045.  If the words of a written contract are clear and explicit and lead to no absurd consequences, a court must apply the contract as written with no further attempt to interpret the parties' intent.  La. Civ. Code art. 2046; see also Barnco Intern., Inc. v. Arkla, Inc., 28,157 (La. App. 2 Cir. 11/15/96); 684 So.2d 986, 991 (citation omitted) ("Ordinarily, the meaning and intent of the parties to a written instrument should be determined within the four corners of the document, and its terms cannot be explained or contradicted by extrinsic evidence." ).  "[This] rule . . . does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties."  Badalamenti v. Jefferson Guar. Bank, 99-1371 (La. Ct. App. 5 Cir. 4/25/00); 759 So.2d 274, 281.

### (1)    Pre-Acquisition Billing

In its Second Supplemental and Amending Counterclaims, TRC identified five particular instances of "projects which involved invoicing for work which had not yet been completed satisfactorily": Lake Bruin State Park, Avoyelles Airport Authority, Livingston Heights Subdivision, LOTD-off-system bridge replacement in Grant Parish, and the main focus of the parties' memoranda, AWC.  TRC contends that Willis breached the representations made in 3.5, 3.15, 3.16, and 3.25 of the Purchase Agreement by failing to disclose these projects as liabilities.

Willis contends that he properly billed AWC 70% of the contract price on July 19, 2004,

13

for the design he completed prior to TRC's acquisition of WEI. He further contends that the

remaining 30% was sufficient to complete the project, but that TRC lost money because its

employee, Martin, failed to budget. He also argues that TRC accounted for amounts outstanding

in his accounts receivable by paying him a lesser amount as net worth at the time of sale. Finally,

Willis contends that TRC has no evidence of any project, including AWC, where he billed prior

to acquisition for work that was not performed.

TRC responds that, with regard to AWC, there are issues of fact whether Willis was

permitted to bill for completed design, whether he billed 70% or 80% of the contract price, and

whether Willis's alleged design fee could be calculated before the completion of the project.

According to TRC, the net worth value of Willis's accounts receivable did not account for work

in progress. Willis breached the Purchase Agreement because he billed pre-acquisition for work

in progress, but failed to list those projects as liabilities on a schedule attached to the Purchase

Agreement. Because he failed to list these liabilities, TRC contends that Willis is required to

indemnify it for losses on the projects, including AWC.[6]

---

[6]TRC contends that Willis "confuses the misrepresentation as to accounts receivable with the failure
to disclose future liability for work that must be performed, but that cannot be billed." However, any
"confusion" is certainly understandable given the language used in ¶ 7 of TRC's amended counterclaim:

> On information and belief, Willis has breached his representations and warranties in the
> Stock Purchase Agreement and made material misrepresentations to TRC in connection
> therewith, by causing Willis Engineering to submit invoices to clients during the months
> before execution of the Stock Purchase Agreement for work that had not yet been
> performed by [WEI], thus inflating the "Net Worth" of [WEI] as defined in paragraph 2.3(c)
> and 2.3(d) of the Stock Purchase Agreement, knowing that the invoices were for work not
> yet performed by [WEI], and not yet due to be paid to [WEI]. No corresponding adjustment
> was made to the liabilities of [WEI] to account for the work required to support the billed
> receivables. As a result, Willis received as a part of his consideration for his stock,
> payments for work to be performed later by [WEI], and thus inflating the price and
> decreasing the value of the transaction to TRC. . . .By representing that no future liability
> existed with respect to projects, except to the extent that a reserve for future liability was
> reflected in the books of [WEI], Willis thereby breached the representations made in

14

Having fully reviewed the evidence submitted in this case, the Court finds that there is no genuine issue of material fact for trial on TRC's breach of contract claim for improper pre-acquisition billing and failure to disclose liabilities.

### (a)  AWC

The following sections are relied upon by TRC:

**3.5**  **Financial Statements**.  Company has delivered to Buyer true and complete copies of the financial statements of Company as of and for the five-month period ended May 31, 2004 and for the years ended December 31, 2003, and December 31, 2002 (the "Financial Statements").  Except as set forth on Schedule 3.5(A), the Financial Statements have been prepared in accordance with generally accepted accounting principles ["GAAP"] applied on a consistent basis and fairly present the financial position of the Company as of the dates of such statements and the results of its operations and changes in financial position for the periods then ended.  Except as reflected on Schedule 3.5(B), Company has no obligations, liabilities or commitments of any kind whatsoever, accrued or unaccrued, contingent or absolute, other than obligations, liabilities or commitments (i) which are fully reflected or fully reserved against in Company's balance sheet as of May 31, 2004 or the footnotes thereto, (ii) which are not required to be so reflected under [GAAP], or (iii) which were incurred in the ordinary course of business.

**3.15**  **Accounts Receivable**.  All Accounts Receivable of the Company arose in the ordinary course of business from bona fide transactions, and Seller is not aware of any reason why they should not be fully collectible subject to any reserve reflected on the Company's balance sheet and disclosed to Buyer.

**3.16**  **Books and Records**.  All the books, records and accounts of Company are in all material respects true and complete, are maintained in accordance with good business practice and all laws applicable to its business, and accurately present and reflect in all material respects all of the transactions therein described.

---

paragraphs 3.5, 3.15, 3.16, and 3.25 of the Stock Purchase Agreement.

[Doc. No. 69].

15

**3.25   Accuracy of Information**.   None of the representations and warranties of Seller contained herein or the information, documents or other material which has been furnished in writing by Company or Seller or any of their representatives to Buyer in connection with the transactions contemplated by this Agreement contain any material misstatement of fact, or omit any material fact required to be stated herein or therein or otherwise necessary to make the statements herein or therein not misleading.

[Doc. No. 78, Exhibit L].

The parties devote the majority of their argument to the AWC project.  TRC contends that Willis breached one or all of the above-cited provisions of the Purchase Agreement by failing to identify AWC as a liability.

Willis has testified that he billed clients, including AWC, for work that "WEI had performed and for which payment was due and owing."  The AWC project provided for "milestone" billing.  According to Willis, he was entitled to bill 70% of the "engineering design fee upon completion of the design" and the design was complete prior to the Purchase Agreement.  Willis avers that he did not knowingly "pre-bill" for work that had to be performed post-acquisition because there were sufficient funds left to cover the AWC post-acquisition work.  Former WEI engineer, Fontenot, also testified that the AWC engineering design was complete when he was hired in August 2004 and that it had gone to construction.  Willis contends that, as a matter of law, he could not have breached the Purchase Agreement by failing to disclose a liability which did not exist.

TRC relies on the sworn statement of former WEI bookkeeper/office manager[7], Chamberlain, that Willis billed the AWC project 80% of the contract price prior to the signing of

---

[7]Some time after acquisition, Chamberlain's title changed from bookkeeper to office manager, but her general duties remained the same.

16

the Purchase Agreement and that TRC lost approximately $350,000 on the project. TRC also

relies on the statement of its Vice President and Central Region Finance Director, Richard Dale

("Dale"), that TRC lost money on WEI projects which required work, but could not be recovered

from client billing. However, Dale and Chamberlain are not engineers and have no independent

information that Willis misrepresented the work he had done.

Thomas, the TRC civil engineer brought in to finish the AWC project, testified that the

design was complete when he was brought in. The only modifications to the design were the

typical "field refinements" that become necessary during the construction phase of a project.

Thomas has no knowledge that Willis knowingly billed pre-acquisition for work that was

performed post-acquisition. While Thomas testified that the work he performed was

"necessary," he also testified that he was given no budget by his supervisor, Martin. When he

inquired  more than once about the budget, he was told "not to worry," just to get the project

done. Thomas never consulted with Willis to determine if work he was doing had already been

completed because Martin told him not to contact Willis.

Martin, an engineer and lawyer, served a managerial/supervisory role at WEI during the

AWC project. Although Martin also testified that the work performed for AWC post-acquisition

was "necessary," Martin admits that (1) he had no idea how long Willis had worked on AWC, (2)

he is not a Louisiana licensed engineer, (3) he did not perform any "hard" engineering work on

the project, and (4) he did  not "thoroughly" understand the rural development process. Instead,

he concludes that Willis "knowingly" billed AWC for work not performed because Willis

warned him to expect some change in the placement of wells during the construction phase and

the project ultimately went over budget.

17

Given the Court's review of the evidence, it appears that many facts are undisputed.

Willis's design was complete prior to TRC's acquisition of WEI. Thomas and Martin aver that

the post-acquisition AWC work was "necessary," but have no evidence that Willis's pre-billing

was fraudulent, inappropriate, and resulted in his duty to disclose a liability to TRC.[8]  When

Thomas, as lead engineer, was given no budget, it is hardly surprising that the project cost more

than expected to complete.  Similarly, Willis's "warning" to Martin only reinforces that he had a

greater knowledge of the potential pitfalls than did Martin or Thomas, both of whom admit that

they had no experience with this type of project.

However, there are two issues which cannot be resolved and suffice to defeat Willis's

Motion for Summary Judgment. First, Chamberlain, who has personal knowledge of WEI

billing, testified that Willis submitted an invoice to AWC for 80%, not 70%, of the contract

price. TRC points out that WEI actually billed for over $500,000. Certainly, this was more than

70% of the $312,249.00 originally contemplated in the 1997 AWC contract. Although the

contract provided for an adjustment to the price on "Attachment 1," which might explain the

figures, that attachment has not been provided. Because the Court cannot resolve this

discrepancy in Chamberlain's and Willis's testimony, TRC has raised a genuine issue of material

fact for trial on whether Willis improperly billed AWC by at least 10%.

Second, the Court's analysis assumes that Willis correctly avers that he was permitted

under the AWC contract to submit a bill once the design was complete. That analysis fails,

however, if TRC can show at trial that Willis was incorrect. TRC argues that the contract

---

[8]The Court has great reservation whether Martin has personal knowledge sufficient to make a
determination on the necessity of the work, given his lack of experience with rural water development and
his admitted lack of involvement in the actual engineering work on the AWC project.

18

between AWC and WEI permitted Willis to bill 70% for completion of engineering and contract administration services, not just design, and that the 70% could not be determined until the completion of the project because the figures were based upon actual construction costs. The copy of the contract provided to the Court states that WEI could receive 70% of the total compensation "after completion and submission of the construction drawings, specifications, cost estimates, and contract documents, and the acceptance of same by [AWC] and Rural Development." [Doc. No. 88, Exhibit C]. There is no dispute that these documents were all provided to AWC prior to acquisition and these documents appear to be the "design" of the project, but it is unclear what "acceptance" was required. TRC has provided some evidence that acceptance was not complete prior to the Purchase Agreement. At this stage, the Court has not been presented with sufficient evidence to resolve, as a matter of law, whether Willis was permitted to bill for his completed "design" prior to September 1, 2004.

If Willis knowingly billed 80% of the AWC contract price or he knowingly billed prior to the milestone under the contract, then TRC may be able to show that Willis breached the Purchase Agreement by failing to disclose the AWC project as a liability for billings in advance of revenue earned. For these reasons, TRC may proceed to trial on its counterclaim against Willis for breach of contract based upon his failure to disclose his alleged pre-billing on the AWC project. Willis's motion for summary judgment on this claim is DENIED.

### (b)    Other Projects

The evidence on the other projects is less than compelling. Of the remaining four projects listed, TRC has presented no evidence to support its contention that Willis improperly billed the clients prior to completion of work.

TRC again relies on the affidavits of Chamberlain and Dale, both of whom attest to TRC's financial losses. While Chamberlain and Dale have knowledge of billing and financial losses, they have no engineering knowledge whether Willis knowingly billed clients for work that he had not completed and then failed to disclose these amounts as a liability.

One final project not listed in TRC's Second Supplemental and Amending Counterclaims appears in Chamberlain's affidavit. Chamberlain attests that Willis billed for the design of the Marksville Sidewalk project[9] prior to the execution of the Purchase Agreement, but that she "anticipates difficulties collecting the outstanding amount owed" on that project because of design deficiencies. [Doc. No. 88, Exhibit D]. Chamberlain has no personal knowledge, however, whether the design was truly defective or incomplete at the time of Willis's billing. TRC has presented no evidence from a qualified engineer to support its claim.

Accordingly, Willis's Motion for Summary Judgment on TRC's breach of contract counterclaim based on these remaining projects is GRANTED, and these claims are DISMISSED WITH PREJUDICE.

### (c)     Indemnity

TRC seeks to obtain indemnification from Willis based upon his alleged breaches of contract. Willis has moved for summary judgment, contending that this claim is untimely because he had no notice of this claim until more than three years later. The Court disagrees.

If TRC succeeds in proving that Willis knowingly billed the AWC project improperly and

---

[9]Although this project is not listed in TRC's Second Supplemental and Amending Counterclaims, Willis has not raised an objection to its inclusion in Chamberlain's affidavit, other than to say that she has no personal knowledge to support any statements about engineering. Therefore, the Court has addressed this claim as well.

20

failed to disclose this liability, then it would be able to present evidence on its claim for

indemnity under the Purchase Agreement. As TRC correctly points out, under Federal Rule of

Civil Procedure 15(c)(2), its first mention of the indemnity provision of the Purchase Agreement

in its Second Supplemental and Amending Counterclaim relates back to the filing of the original

counterclaim because the facts upon which the claim is based were timely brought to Willis's

attention. See Garvin v. City of Philadelphia, 354 F.3d 215, 220-21 (3rd Cir. 2003) (citing 6A

Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 1497, at 85 (2d ed. 1990)).

Willis's Motion for Summary Judgment on TRC's request for indemnity is DENIED.

### (2)   Disclosure of Material Obligations

TRC also alleges that Willis breached Section 3.10 of the Purchase Agreement by failing

to disclose all material obligations. Willis moves for summary judgment on this claim because

he complied with the Purchase Agreement by listing all written contracts on Schedule 3.10 and

by providing TRC with work-in-progress lists that identified all clients and on-going projects of

WEI. Even if Willis breached the Purchase Agreement by failing to list all material obligations

on Schedule 3.10, he contends that TRC has not identified any damages resulting from the

breach.

Section 3.10 provides as follows:

Contracts. Schedule 3.10 contains a list of all material contracts, commitments,
agreements, sales and purchase orders and other obligations relating to which
company is a party or by which Company may be bound. There is no contract,
commitment, agreement, sale or purchase order or other obligation which is not listed
in said Schedule 3.10 and which is of material importance to Seller.

[Doc. No. 78, Exhibit L]. Schedule 3.10 contains the following, identified as "List of Signed

Contracts":

       Ward 10 Sewer
       Ward 10 Recreation Park
       City of Alexandria - Jackson Street and [Horseshoe] Drive Intersection
       Improvements
       LADOT - Beauregard Bridge
       LADOT - Grant Parish Bridge
       LADOT - Sabine Parish Bridge
       City of Alexandria - [Horseshoe] Drive @ Masonic Drive Intersection Improvements
       Spring Bayou Water System
       Avoyelles Water Commission - Well Field and Aqueduct
       City of Alexandria - Bayou Rapides and Georgetown Subdivision Drainage
       City of Alexandria - Southern Heights Street and Drainage Improvements
       City of Alexandria - McDonald Street Drainage Improvements

[Doc. No. 78, Exhibit L, Schedule 3.10].

Under the plain language of Section 3.10 of the Purchase Agreement, Willis was required

to provide a "list of all material contracts, commitments, agreements, sales and purchase orders

and other obligations relating to which Company is a party or by which Company may be

bound." This provision clearly covered more than written contracts. Even if TRC, as Willis

argues, is valuing "form over substance," TRC has established a genuine issue of material fact

whether Willis breached Section 3.10 of the Purchase Agreement.[10]

Nevertheless, TRC cannot survive summary judgment unless it also has evidence that

Willis's breach caused it damages. Willis contends that he disclosed all material obligations

prior to acquisition, and, therefore, TRC has no damages. It is undisputed that Willis identified

all "signed contracts" on Schedule 3.10. Prior to acquisition, Willis also submitted to TRC lists

of clients and works in progress. As examples, he produced two lists of projects, one which was

undated and titled "Estimated Fees of Projects Existing and Pending," and one which was dated

---

[10]Willis has essentially conceded that he breached the Purchase Agreement by failing to list all
material obligations on Schedule 3.10, but TRC did not seek summary judgment on this issue. Therefore,
the Court finds only that there is a genuine issue of material fact for trial.

July 1, 2004, and titled "Work in Progress." [Doc. No. 79, Exhibit M].

In its Opposition memorandum, TRC does not deny that it was provided these lists. Rather, TRC argues that the lists do not identify Tennyson Oaks phase 7, Lake Bruin, Value Place, or Livingston Heights projects, "all of which have resulted in significant losses or caused problems to TRC." [Doc. No. 88, p. 8].

Of those four projects, Willis provided additional evidence attached to his Reply memorandum, which shows that he disclosed two projects. In an August 9, 2004 email to Craig Becker of TRC, Willis states that "[a]n example of my overwhelming problem this morning is my checklist of immediate projects." [Doc. No. 95, Exhibit B]. Willis then lists thirty-three projects, including "Tennyson Phase 7 construction" and "Lake Bruin State Park meeting on a new project currently underway." TRC did not seek leave to file a sur-reply to challenge this evidence or to produce any other evidence that it was damaged by Willis's breach of Section 3.10 of the Purchase Agreement.

Accordingly, the Court finds that Willis's Motion for Summary Judgment on this claim is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that TRC's claim is based on any material obligation other than Value Place and Livingston Heights projects.[11] The Court finds that the evidence is insufficient to show that TRC received notice of the Value Place and Livingston Heights projects prior to acquisition. Willis's motion is DENIED as to these projects.

_____

[11]While Willis contends that the documents he has submitted are merely "examples" of his disclosures, he has provided no specific evidence that he notified TRC of the Value Place or Livingston Heights projects prior to acquisition.

23

### (3)    Use of Willis's Seal and Signature

TRC also alleges breach of contract based on the use of Willis's engineering and survey

seal and reproductions of his signature. Willis moves for summary judgment on this claim

because the only instance cited by TRC, the Lake Bruin project, is one in which he had reviewed

and approved the contents of drawings and specifications and then authorized use of his signature

and seal. Under these circumstances, Willis contends that there is no law or rule prohibiting the

practice. Even if the practice did violate some law, there is no evidence that TRC was damaged

by this practice.

Chamberlain avers that "Willis permitted WEI employees to place his signature on

engineering drawings and surveys by use of a signature stamp, signature tape, or scanned

signature." [Doc. No. 88, Exh. D]. TRC contends that Willis's practice violated the Louisiana

Administrative Code, title 46, part LXI, governing the practice and oversight of engineers and

land surveyors. Under Section 2701(A)(2)(e), computer generated seals may be used on final

drawings, as long as a "handwritten signature is placed adjacent to or across the seal and the date

is written below the seal." La. Admin. Code 46:LXI, ch. 27. "Signature" is defined as a

"handwritten message identification containing the name of the person who applied it," or

"digital signature which is an electronic authentication process attached to or logically associated

with an electronic document . . . linked to a document in such a manner that the digital signature

is invalidated if any data in the document is changed." La. Admin. Code 46:LXI, Ch. 1. TRC

attaches examples of drawings that have Willis's seal affixed, but which allegedly have a replica

of Willis's signature affixed, not the handwritten or electronic signature contemplated by the

Administrative Code. [Doc. No. 88, Exhibit G].

24

TRC argues that Willis's violation is a breach of Section 3.17 of the Purchase Agreement where Willis represented that WEI's "business as currently conducted" did not "violate or infringe" any rules or laws. Willis's failure to disclose this practice allegedly damaged TRC because "TRC would not have completed the deal, or would have paid a lesser amount had the truth been known." TRC has presented no factual support for this assertion. In fact, TRC admits that Willis's alleged violation "has not caused pecuniary damages."

The Court finds that Willis is entitled to summary judgment on this counterclaim. Even if Willis's signature was improperly affixed to documents, TRC can only recover for breach of contract if it can establish some damage. See Jackson v. Lare, 34,124 (La. App. 2 Cir. 11/1/00); 779 So.2d 808, 814 (A "court is not justified in fixing damages in the absence of definite proof. The [claimant] has the burden of proving the damage suffered by him as a result of the breach of contract. . . . While the absence of independent corroborating evidence may not be fatal to the plaintiff's burden of proof, the lack of even a minimal degree of detail or specificity as to the extent of loss precludes an award. Speculation and conjecture cannot be accepted as a basis for fixing loss of earnings or profits.") (citing Campbell v. Lelong Trust, 327 So.2d 533 (La. App. 2 Cir.1976), writs denied , 331 So.2d 494, 496 (La. 1976)).

In theory, Willis's alleged improper practice might result in damage to TRC if, for example, it caused a municipal client to reject drawings or resulted in Willis's license being suspended while he was working for TRC, but TRC has no evidence of any harm. TRC's speculation that there might possibly be some damage in the future is disingenuous when this case has been going on for three years, thirty depositions have been taken,[12] numerous documents

---

[12][Doc. No. 78, p. 2 n.2].

have been exchanged, the case is set for trial in September, and TRC has yet to produce any evidence of tangible harm. Likewise, the idea that TRC **might** have paid less for WEI's stock if it had known of this alleged practice is also speculative.[13] TRC has presented no evidence of how Willis's alleged practice would have had any effect at all on its bottom line.

Willis's Motion for Summary Judgment on TRC's breach of contract claim based on his failure to disclose his alleged improper use of his seal and signature is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### (4)     Bad Faith

TRC asserts that Willis's alleged breaches of contract were made in bad faith. Willis now moves for summary judgment on this bad faith claim.

"An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civ. code art. 1997. Under comment (b), "[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." La. Civ. Code art. 1997 cmt. b.

In its Second Supplemental and Amending Counterclaim, TRC identifies its bad faith claim against Willis as follows:

> On information and belief, Willis was in bad faith in his performance of the obligations that he owed to TRC under the Stock Purchase Agreement, expressing the intent to seek or to cause a rescission of the agreement within months after the execution of the agreement on September 1, 2004.

[Doc. No. 69]. Willis interprets this paragraph to mean that TRC's only basis for its bad faith

---

[13]The affidavit of TRC's expert, Creighton Early, is of no use in this regard. While he has averred that he is prepared to testify about the methods and tools used to evaluate engineering firms, he has not offered any factual averments as to how Willis's alleged improper practice would have affected this transaction.

claim is its belief that he expressed the intent to seek or cause a rescission. TRC contends that

the paragraph, when read with the rest of the pleading, means he acted intentionally (or with

reckless disregard) by making false representations or withholding necessary disclosures. TRC

contends that Willis "was in bad faith when he signed the [Purchase Agreement]" because he

"had no intention of living by [its] terms." [Doc. No. 88, p. 12] and, as evidence of his bad faith,

TRC points to Willis's speaking of and taking steps toward having the transaction rescinded

within three months of acquisition.

The Court has reviewed the affidavit and depositions of Chamberlain and MacNeil, the

two TRC employees cited as sources for this claim, and finds that TRC has failed to present

evidence sufficient to allow the Court, as fact finder at trial, to conclude that Willis acted in bad

faith with one limited exception. Chamberlain states in her affidavit that "[w]ithin a few months

of the sale, Willis drafted an email to TRC rescinding the sale. I do not know whether the email

was sent."[14] [Doc. No. 88, Exhibit D]. MacNeil testified that Willis exhibited signs of "seller[']s

remorse." [Doc. No. 78, Exhibit K, p. 16]. This testimony, at best, demonstrates that Willis had

regrets about selling his business after the fact.

TRC contends that Willis took certain actions in bad faith **before and at the time** he

signed the Purchase Agreement. The statements by Chamberlain and MacNeil do not constitute

sufficient evidence to show that Willis acted in bad faith, intentionally and maliciously, prior to

---

[14]Counsel states in brief that "Willis spoke openly of having the transaction rescinded shortly after
the deal was announced to his employees" and that "[w]ithin the first three months of the sale he sought
advice of counsel from multiple law firms to see about rescinding the sale." [Doc. No. 88, p. 13]. Counsel
cites Chamberlain's affidavit, but her affidavit does not support his statements. Counsel is cautioned that
any factual argument made to the Court should be supported by appropriate evidence.

or at the time he signed the Purchase Agreement.[15] To the contrary, his August email to Becker
indicated his strong desire for the acquisition to take place as soon as possible.

However, there is one issue the Court cannot resolve on summary judgment. In his
statement of material facts, Willis contends that certain survey files, the "Sandefur" files,
belonged to him personally, not to WEI. TRC contends that Willis did not disclose that these
files belonged to him. In her affidavit, Chamberlain attests that Willis showed the files to Riaz
Ahmed and other TRC representatives in the summer of 2004 and explained how important they
were. Neither party briefed how the Sandefur files relate to any of the claims in this matter. Even
so, given these disputed facts, the Court concludes that TRC has raised a genuine issue of
material fact on its bad faith claim, solely on the basis of the Sandefur files.

Willis's Motion for Summary Judgment on TRC's bad faith claim is GRANTED IN
PART and DENIED IN PART. TRC may present evidence at trial relating to Willis's alleged
failure to disclose his personal ownership of the Sandefur files. TRC's bad faith claim is
otherwise DISMISSED WITH PREJUDICE.

## b.    Violation of Rule 10b-5 of the Securities Act of 1934

Finally, TRC also brought a counterclaim against Willis under Rule 10b-5 of the
Securities Act of 1934, 15 U.S.C. § 78j. Willis moves for summary judgment on this claim as
well.

In order to meet its burden of proof on this cause of action, TRC must show the

---

[15]Of course, these statements are also insufficient to show bad faith after the fact. TRC has pointed
to no evidence that Willis shirked his duties or attempted in some other way to sabotage the success of WEI
post-acquisition. Given the earnout he would have been entitled to, such actions would not have been in
Willis's best interest either.

following: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the

purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a causal connection

between the material misrepresentation and the loss. Oscar Private Equity Investments v.

Allegiance Telecom, Inc., 487 F.3d 261, 264 (5th Cir. 2007) (citing Dura Pharms., Inc. v.

Broudo, 544 U.S. 336 (2005)). With regard to the scienter requirement, the Fifth Circuit has

instructed:

> Nevertheless, liability under Rule 10(b)(5) requires not only that the party make a
> statement which contains an untrue statement of material fact or omits a material
> fact necessary in order to make the statement not misleading, but also that the
> party have done so with "not merely simple or even inexcusable negligence" but
> rather with "scienter" meaning an "intent to deceive, manipulate, or defraud" or
> that "severe recklessness" in which the "danger of misleading buyers or sellers . . .
> is either known to the defendant or is so obvious that the defendant must have
> been aware of it."

Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 366 (5th Cir. 2004)

(citing Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir.1981) (en banc).

For the reasons stated above, the Court finds that TRC has raised a genuine issue of

material fact for trial based on Willis's alleged failure to disclose his ownership of the Sandefur

files. Otherwise, the Court finds that TRC has produced no evidence of the necessary scienter to

support its Securities Act claim against Willis.

Willis's Motion for Summary Judgment on TRC's Securities Act claim is GRANTED IN

PART and DENIED IN PART. TRC may present evidence at trial relating to the Sandefur files.

TRC's Securities Act claim is otherwise DISMISSED WITH PREJUDICE.

## III.   CONCLUSION

For the foregoing reasons, TRC's Motion for Partial Summary Judgment [Doc. No. 77] is

DENIED.  Willis's Motion for Summary Judgment [Doc. No. 78] is GRANTED IN PART and

DENIED IN PART.  The motion is GRANTED, and TRC's breach of contract claim based on

the use of Willis's engineering seal and signature is DISMISSED WITH PREJUDICE.  The

motion is GRANTED IN PART and DENIED IN PART, as set forth above, on TRC's breach of

contract claims based on pre-acquisition billing and failure to disclose material obligations, on its

bad faith claim, and on its Securities Act claim.

MONROE, LOUISIANA, this____12____day of____May_____, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE